# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC,<br><br>　　　　　　　　　　　　　　Plaintiff,<br>vs.<br><br>BRENDAN MCNAMARA; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,<br><br>　　　　　　　　　　　　　　Defendants. | CASE NO. 11 CV 1092 MMA (RBB)<br><br>**ORDER RE: PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>[Doc. No. 3] |

This matter came before the Court on May 25, 2011 for hearing on Plaintiff Fidelity Brokerage Services LLC's *ex parte* motion for a temporary restraining order and order to show cause why a preliminary injunction should not issue. [Doc. No. 3.] Attorneys James Turken and Stacey Schmidt appeared on behalf of Fidelity, and attorneys John Vaughn and Timothy Pestotnik appeared on behalf of Defendants Brendan McNamara and Merrill Lynch, Pierce, Fenner & Smith, Inc. After the May 25 hearing, the Court issued an order permitting the parties to submit certain additional information to the Court. Upon consideration of the arguments made by counsel at the hearing, as well as the written submissions of the parties, the Court concludes Fidelity has demonstrated injunctive relief is appropriate.

## **BACKGROUND**

Fidelity recently filed a civil complaint and statement of claim with the Financial Industry Regulatory Authority ("FINRA") against its former Account Executive Brendan McNamara, and

McNamara's current employer Merrill Lynch, for among other things, misappropriation of trade secrets and unfair competition. [Doc. No. 1.]  Fidelity asserts that during McNamara's tenure at Fidelity he twice signed employment agreements containing confidentiality and non-solicitation clauses. [Doc. No. 1, Exhs. B, C.]  The Agreements indicate, generally, that McNamara would have access to Fidelity's confidential and trade secret information during his employment, and that he agreed not to improperly use, copy, retain or disclose any such information upon termination of his employment with Fidelity.  The Agreements further state McNamara shall not solicit any of Fidelity's customers for a one year period after his employment with Fidelity terminated.

During McNamara's employment with Fidelity, he allegedly "had access to and acquired contact and confidential financial information for close to one thousand (1,000) Fidelity accounts, representing more than $238 million in assets under Fidelity management." [Doc. No. 1, ¶35.] Fidelity alleges that in or around December 2010 McNamara began using his "Fidelity computer to access, or 'look up,' confidential and trade secret information for a number of Fidelity customers in very short, sporadic time periods." [*Id*. at ¶40.]  Fidelity asserts McNamara's look up activity was suspicious and continued until McNamara resigned on March 3, 2011 to take a job with competitor Merrill Lynch.  [*Id*. at ¶¶40-45.]

According to Fidelity, within days of McNamara's resignation, he, in concert with Merrill Lynch, "began sending letters to Fidelity's customers regarding his new employment." [*Id*. at ¶47.]  Fidelity acknowledges McNamara may legally notify his clients that he moved to Merrill Lynch, but argues McNamara wrongfully "called numerous Fidelity customers, soliciting their Fidelity accounts for Merrill Lynch." [*Id*. at ¶¶47-48.]  McNamara admits he created a customer list from memory after leaving Fidelity by using publically available sources to obtain contact information for the names he recalled. [*See id*. at ¶56.]  Fidelity asserts McNamara used this information to do more than merely announce his new employment to his former clients, as Fidelity received reports from several clients that McNamara had contacted them and discussed moving their assets to Merrill Lynch on multiple occasions. [*Id*. at ¶48.]  In one case, McNamara allegedly continued to solicit a Fidelity client after she unequivocally indicated she had no desire to move her accounts. [*Id*. at ¶¶52-54.]

1  Fidelity estimates approximately $5 million of client assets previously managed by Fidelity
2  have been moved to Merrill Lynch since McNamara left three months ago. [*Id*. at ¶61.] From
3  March 2011 through early May 2011, Fidelity engaged in discussions with counsel for Merrill
4  Lynch regarding McNamara's alleged activities in an attempt to reach an amicable solution to
5  Fidelity's concerns. [*Id*. at ¶51.] When it became clear to Fidelity that an amicable resolution was
6  not possible, Fidelity filed the present action and motion for a temporary restraining order on May
7  18, 2011. Fidelity argues McNamara should be ordered to "return" the list of trade secret client
8  names he recreated from memory after moving to Merrill Lynch, and that Defendants should be
9  enjoined from soliciting Fidelity's customers pending resolution of its claims before FINRA.

## LEGAL STANDARD

11  To prevail on a motion for temporary restraining order or to receive preliminary injunctive
12  relief, the moving party bears the burden of demonstrating "(1) that it is likely to succeed on the
13  merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that
14  the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Earth*
15  *Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (citation omitted). "A preliminary
16  injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits
17  were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild*
18  *Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal marks and citation omitted).
19  However, "plaintiffs must establish that irreparable harm is likely, not just possible." *Id*. at 1131
20  (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008)). Because injunctive relief prior to
21  trial is an extraordinary remedy, it is to be granted sparingly. *Id*. Moreover, on application for
22  injunctive relief the court need not decide disputed questions of fact. *Arthur J. Gallagher & Co. v.*
23  *Edgewood Partners Ins. Ctr.*, 2008 U.S. Dist. LEXIS 8924 *7-9 (N.D. Cal.) (citations omitted).

## DISCUSSION

### I. JURISDICTION

26  The Court has jurisdiction to enter injunctive relief "to preserve the *status quo* pending a
27  final determination of the merits of this dispute" by FINRA. *Merrill Lynch v. Chung*, 2001 U.S.
28  Dist. LEXIS 3248 *6 (C.D. Cal.) (italics in original); *Toyo Tire Holdings of Americas Inc. v.*

*Continental Tire North America, Inc.*, 609 F.3d 975, 980 (9th Cir. 2010) ("district court has authority to issue equitable relief in aid of arbitration").

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

Under California law, the Uniform Trade Secrets Act ("UTSA") prohibits employees from misappropriating their former employer's trade secrets. Cal. Civ. Code. § 3426.1. "Actual or threatened misappropriation may be enjoined." *Id.* at § 3426.2. Thus, to succeed on the merits of its claims, Fidelity must demonstrate the information McNamara possesses constitutes a trade secret, and that McNamara has either misappropriated such information, or that McNamara's possession poses a threat of misappropriation.

Customer lists may qualify as trade secret information subject to protection under UTSA. *The Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009). At the hearing, Defendants appeared to concede the list of customer names McNamara recreated from memory after he joined Merrill Lynch contains confidential trade secret information belonging to Fidelity.[1] The parties primarily dispute whether McNamara's alleged use of Fidelity's client names is protected. Thus, for purposes of this order the Court assumes Fidelity's client names are protected trade secret information.

After joining Merrill Lynch, McNamara admits he recalled the names of several clients he serviced while at Fidelity, and then used publically available resources to obtain contact information for these clients. [Doc. No. 15-1, ¶4.] McNamara asserts he used the information to announce his "new business affiliation to as many of [his] Fidelity clients as [he] could (depending on his ability to obtain sufficient contact information from those publically available resources . . .)." [*Id.* at ¶14.] McNamara states he sent announcement cards to approximately 50 Fidelity clients and called some clients to announce his move, but he denies asking any of the clients for their business or otherwise soliciting them to move their accounts from Fidelity to Merrill Lynch. [*Id.* at ¶¶5, 13-14.]

///

---

[1] Defendants maintain, however, that McNamara did not misappropriate Fidelity's trade secrets as it is lawful for him to use the client names to announce his move to Merrill Lynch.

The parties agree California law permits McNamara to notify Fidelity clients that he has moved to Merrill Lynch. *Aetna Bldg. Maint. Co. v. West*, 39 Cal. 2d 198, 203-04 (1952). McNamara may also discuss business with the clients, if invited to do so. *Id*. at 204. But he may not ask the clients for their business or otherwise solicit them to transfer their accounts from Fidelity to Merrill Lynch. *Id*. at 203-204. Fidelity argues that after McNamara lawfully announced his new employment to approximately 50 clients, he impermissibly continued to call and solicit Fidelity clients. In support, Fidelity provides a declaration from William Gloyd, Fidelity's Vice President, Branch Office Manager for its Del Mar location, indicating he received reports that "McNamara was calling Fidelity customers to discuss potentially doing business with them at Merrill Lynch." [Doc. No. 5, ¶16.] Specifically, four customers "reported that McNamara had contacted them and discussed moving their assets to him at Merrill Lynch." [*Id*.][2] In addition, Gloyd states he learned that McNamara contacted one particular customer in early May 2011 for a third time after the customer indicated she had no interest in transferring her accounts from Fidelity to Merrill Lynch. [*Id*. at ¶24.] Specifically, Gloyd declared:

> On May 9, 2011, I learned that a Fidelity Account Executive, John Metzger, had received a telephone call that same day from one of the customers who had previously been assigned to McNamara and was now assigned to him, [Ms. S.] Ms. S advised him that she had been contacted and solicited by McNamara on several occasions, with the most recent instance occurring just a few days earlier. I immediately telephoned Ms. S to follow up with her about her report to Mr. Metzger. During my conversation with her, I learned that McNamara initially contacted her by mail and telephone in March 2011. At that time, she advised McNamara that she was not interested in transferring her account from Fidelity to Merrill Lynch. Nonetheless, Ms. S reported that on or about May 6, 2011, she spoke with McNamara again by telephone and he solicited her business. When McNamara spoke to her, he appeared to be aware of her account type and investment interests, spoke negatively (and comparatively) about specific Fidelity products relating to her account, and requested a meeting to discuss the potential transfer of her account to Merrill Lynch. The customer was very concerned by what McNamara had told her, and Mr. Metzger had to invest a substantial amount of time to reassure her of Fidelity's ability to manage her account.

[*Id*.]

---

[2] Fidelity identifies the four customers by name but has redacted this information to preserve its clients' privacy.

Defendants urge the Court to disregard the majority of Gloyd's declaration because it is largely hearsay in that it merely recounts his conversation with Ms. S. [Doc. No. 15, p.16-19.] Fidelity has not submitted any client declarations indicating inappropriate contact from McNamara. However, the Court declines to disregard Gloyd's testimony entirely on the ground that it does not comply with the formal requirements of the Federal Rules of Evidence. As the Supreme Court has explained: "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . ." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, Gloyd's declaration describes a specific conversation he had with a particular client, and he recounts the details of that conversation, including the concerns the client expressed to him. Although Gloyd's declaration alone may not be sufficient to carry Fidelity's burden during arbitration, the Court finds the information persuasive in its limited consideration of Fidelity's request for immediate injunctive relief. *See also*, *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.") (citations omitted).

During the hearing, defense counsel argued that courts have only applied these less rigorous evidentiary standards when the circumstances and need for injunctive relief were more exigent than they are here. The defense points out that McNamara left Fidelity more than three months ago, giving Fidelity adequate time to develop competent admissible evidence. The Court is mindful, however, that from the time of McNamara's departure in March 2011, through early May 2011, Fidelity was actively working with Merrill Lynch to informally resolve its concerns. Gloyd learned of McNamara's alleged repeated solicitation to Ms. S on May 9, 2011, after McNamara contacted her a third time on May 6. On May 11 Merrill Lynch unequivocally

1 indicated it would not give Fidelity the client list McNamara recreated from memory, and Fidelity
2 filed its complaint and motion for injunctive relief one week later on May 18.  Fidelity acted
3 diligently to protect its trade secret information and should not be faulted for attempting to reach
4 an amicable solution without involving the Court.  Further, the Court disagrees that the threat that
5 McNamara might use Fidelity's trade secret information, which he admittedly has in his
6 possession, does not present a situation as exigent as that in *Camenisch*, where a deaf student filed
7 suit to order a university to provide him with interpreter services.

8      Fidelity further argues that even if the client reports are disregarded, it will still likely
9 prevail at arbitration because McNamara admits he has Fidelity's protected client names in his
10 possession, he acknowledges he has already used the information for its only lawful purpose, and
11 yet McNamara refuses to return the information to Fidelity.  Accordingly, McNamara's conduct
12 alone presents a clear threat of misappropriation that warrants injunctive relief.  The Court
13 concludes that when the record is considered as a whole, Fidelity has put forth sufficient
14 information to demonstrate it may reasonably succeed in the arbitration proceedings.

15      Aside from Gloyd's statements regarding his conversation with Ms. S, Fidelity provides
16 spreadsheets purportedly showing that during McNamara's final months at Fidelity he frequently
17 looked up multiple client accounts in short spans of time.  Fidelity contends this rapid look up of
18 client accounts is suspicious because account executives typically only retrieve one client's
19 information at a time in relatively regular intervals throughout the day when working on the
20 individual accounts.  Fidelity also originally argued that McNamara was looking up the accounts
21 during break times or after normal business hours.  Although Fidelity has since conceded the time
22 of day may not be inherently suspicious, Gloyd maintains that the number and frequency of
23 McNamara's account look ups is concerning.  [Doc. No. 22-2.]  McNamara flatly denies taking
24 any confidential information from Fidelity or soliciting any of Fidelity's clients.  [Doc. No. 15-1.]
25 Nevertheless, while no single piece of evidence indicates Fidelity is likely to succeed on the merits
26 of its claims, when the record is considered in its entirety, the Court finds there is a reasonably
27 possibility that Fidelity will succeed at the FINRA arbitration.  Accordingly, the first factor in the
28 Court's analysis weighs in favor of granting injunctive relief.

### III. IRREPARABLE INJURY

Defendants contend immediate relief is unwarranted because McNamara left Fidelity nearly three months ago and Fidelity is just now seeking injunctive relief. As discussed above, however, the record indicates Fidelity endeavored during that time to resolve its concerns informally with Merrill Lynch, as it had done in the past. On May 11, 2011, Defendants unequivocally refused to return the information sought by Fidelity. On May 18, Fidelity filed the present complaint and motion for a temporary restraining order. Therefore, the purported delay is not reason to deny Fidelity injunctive relief that is otherwise warranted.

Defendants also assert Fidelity has not demonstrated the possibility of irreparable injury because monetary damage does not constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury"). Although Defendants are correct monetary harm alone does not create a likelihood of irreparable injury, Fidelity's asserted risk of harm goes beyond tangible monetary losses. Specifically, Fidelity asserts it will suffer loss of goodwill and damage to its reputation if Defendants are not enjoined from soliciting Fidelity's clients. Fidelity argues their relationship with their clients is based on confidence and trust, and customers will lose trust in Fidelity if McNamara continues to contact them and discuss the clients' personal information that was disclosed to Fidelity in confidence.

Loss of goodwill is irreparable harm that warrants injunctive relief. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent-A-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991) (recognizing that intangible injuries, such as harm to reputation and goodwill, qualify as irreparable harm). Irreparable harm may be found, where as here, Defendants' alleged actions may injure Fidelity's reputation if Fidelity's clients perceive a violation of their confidential information. *Bank of Am. v. Immel*, 2010 U.S. Dist. LEXIS 65358 *7-8 (N.D. Cal.) (citations omitted). Gloyd's declaration, which states Fidelity already expended significant time to reassure Ms. S that Fidelity is capable of maintaining her accounts, indicates Fidelity's fears are not

unfounded. [Doc. No. 5, ¶24.] Accordingly, the second factor weighs in favor of granting Fidelity's request for injunctive relief.

## IV. BALANCE OF HARDSHIPS

Fidelity asserts the balance of hardships weighs in favor of granting its request for a temporary restraining order because the requested relief is narrowly tailored to prevent McNamara and Merrill Lynch from unlawfully using Fidelity's trade secrets to solicit Fidelity clients; and Fidelity's desired relief will not prevent McNamara and Merrill Lynch from servicing or marketing other clients. McNamara asserts his career will be crippled if he cannot communicate with his clients. [Doc. No. 15, p.12.] The Court finds McNamara's concern is exaggerated. First, McNamara admits he has already announced his move to all the Fidelity clients he was able to locate through publically available sources. Although the law permits McNamara to make multiple announcements, his clients already have his new contact information and know where to reach him if they desire to transfer their accounts to Merrill Lynch. Second, Fidelity has not requested an injunction that will prevent McNamara from having *any* contact with his former clients. Fidelity agrees McNamara may assist clients who have already reached out to him, or who may reach out to him in the future. Fidelity also does not intend to interfere with McNamara's ability to service former Fidelity clients who have moved their accounts to Merrill Lynch, nor will Fidelity impede any client's efforts to transfer his or her account from Fidelity in the future. Fidelity merely desires to prevent McNamara and Merrill Lynch from using Fidelity's trade secret information to solicit clients McNamara knows to be valuable assets from his employment with Fidelity.

The relative harm McNamara may suffer if he cannot use Fidelity's trade secret information to make repeated announcements of his move to Merrill Lynch is slight when compared to the intangible harm Fidelity may suffer in losing the faith and trust of its customers. Thus, the balance of hardships tips decidedly in favor of Fidelity and issuing a temporary injunction.

///

## V.   PUBLIC INTEREST

The public has an interest in *fair* competition, and therefore an interest in protecting Fidelity's trade secret information. *Immel*, 2010 U.S. Dist. LEXIS at *8-9. The Court recognizes the public also has an interest in allowing people the freedom to choose which financial advisor they want to work with. *See, e.g., Prudential Securities, Inc.. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998). In this case, however, Fidelity has not impeded its clients' efforts to transfer their accounts to Merrill Lynch when requested. Nor does Fidelity desire to preclude McNamara from responding to client inquiries or servicing clients who have transferred their accounts. Therefore, because Fidelity has shown there is a threat of misappropriation due to McNamara's continued possession of its trade secret client information, the public interest weighs in favor of issuing a temporary restraining order.

All four factors weigh in favor of issuing an order restraining certain limited conduct by Defendants for a short time until the FINRA arbitration concludes. Fidelity has shown a likelihood of success on the merits, that irreparable injury is likely if Defendants are not enjoined, that the balance of hardships tips in Fidelity's favor, and the public interest favors issuing injunctive relief. What remains is whether Fidelity must post a bond under Federal Rule of Civil Procedure 65(c), and what specific activity shall be enjoined.

## VI.   BOND

Under Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit has "recognized Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir.1999)). "The district court may [therefore] dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

Here, Defendants request the Court enter a bond in the amount $20,000 to "protect them in the event that any injunction is proven wrongful." [Doc. No. 27, p.2.] Defendants assert $20,000

is appropriate given the bond amounts other courts have required in "cases involving injunctions against departing employees," including cases in which Fidelity was required to post a bond. [*Id.* at p.2-3.] But Defendants fail to make any connection between the potential harms in the cases cited, and whether those harms could potentially occur here. Simply, Defendants do not identify what harm they may suffer if a bond does not issue, nor show that "some harm is more likely absent the posting of a security bond." *Jorgensen*, 320 F.3d at 919.

As set forth below, the Court's order enjoins Defendants from engaging in very limited conduct, for a relatively brief amount of time. In addition, Fidelity makes the salient point that the injunction does not prohibit Defendants from engaging in lawful conduct to service their new and existing clients. Rather, it narrowly restricts the unlawful solicitation of Fidelity's clientele through use of Fidelity's trade secret information.

Accordingly, absent an identifiable harm Defendants may suffer if the injunctive relief is ultimately deemed unnecessary, the Court in its discretion finds no bond shall issue.

## VII. CONDITIONS OF TEMPORARY RESTRAINING ORDER

For the reasons discussed above, the Court concludes a narrowly tailored order restraining certain limited conduct by Defendants McNamara and Merrill Lynch until completion of the expedited FINRA arbitration proceedings is appropriate. Accordingly, the Court **ORDERS** as follows:

Defendants are hereby enjoined and restrained, pending the completion of an expedited hearing on the merits of Fidelity's claims before FINRA, as follows:

(1) Defendants, and all persons acting in concert with them, are not permitted to create, recreate from memory, or possess any records or documents (whether in original, computerized, electronic, hard copy, handwritten or memorialized in any other form) containing Fidelity's Confidential Information, as that term is defined in McNamara's Fidelity Employee Agreement, executed by McNamara on November 10, 2010, which expressly includes but is not limited to, information pertaining to Fidelity's customers that was obtained or derived from McNamara's employment with Fidelity ("Fidelity's Confidential Information");

(2) Defendants, and all persons acting in concert with them, are not permitted to use, disclose or transmit in any manner whatsoever, Fidelity's Confidential Information; and

(3) Defendants, and all persons acting in concert with them, are not permitted to initiate contact with any Fidelity customers whose identities are known to them as a result of McNamara's employment with Fidelity, for the purpose of encouraging, inviting, suggesting, or requesting the transfer of any accounts or business or patronage from Fidelity. Notwithstanding the foregoing, if Fidelity customers initiate contact with Defendants, or either of them, Defendants shall be permitted to respond to and accept business from said customer(s). Defendants shall also be permitted to continue servicing former Fidelity clients who have already moved their accounts to Merrill Lynch.

(4) Within seven (7) days from the entry of this Order, Defendants, and all persons acting in concert with them, shall relinquish custody and control of the aforementioned records and documents, *see para.1 supra*, and confirm the permanent deletion of electronic records containing Fidelity's Confidential Information. The records and documents must be submitted directly to the Chambers of the undersigned via courier no later than **5:00 p.m.** on **June 3, 2011.** The Court shall maintain possession of the records and documents for the duration of the arbitration proceedings. Fidelity shall notify the Court of the arbitrators' final decision within three (3) days of its issuance. If the arbitration panel concludes Defendants are not entitled to possess Fidelity's Confidential Information, the Court shall destroy the records and documents relinquished into its possession by Defendants. If the arbitrators conclude Defendants are entitled to lawfully possess and use Fidelity's Confidential Information, Defendants shall coordinate with the Court for retrieval of the records and documents.

(5) Pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties agree to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

/ / /

(6) The above terms and conditions shall remain in full force and effect during the arbitration proceedings and shall automatically terminate without further order from the Court upon conclusion of the arbitration.

**IT IS SO ORDERED.**

DATED: May 27, 2011

*[signature]*

Hon. Michael M. Anello
United States District Judge

- 13 -

11cv1092